722 F.2d 1574
 9 Collier Bankr.Cas.2d 910, 11 Bankr.Ct.Dec. 529,
Bankr. L. Rep. P 69,511
 In re Gerald KAISER, Debtor.
Chester B. SALOMON, as Trustee of the Estate of Gerald
Kaiser, Debtor, Plaintiff-Appellee,
v.
Gerald KAISER, Defendant-Appellant.
Chester B. SALOMON, as Trustee of the Estate of Gerald
Kaiser, Debtor, Plaintiff-Appellee,
v.
Gerald KAISER, Joan Kaiser, Harry Gorowitz and Yetta
Gorowitz, Defendants,
Gerald Kaiser and Joan Kaiser, Defendants-Appellants.
 No. 96, Docket 83-5019.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 12, 1983.
Decided Nov. 18, 1983.
 
 Seymour J. Silberberg, New York City (Ruben Schwartz, Brett J. Meyer, Ruben, Schwartz & Schnall, New York City, of counsel), for defendants-appellants.
 David M. Green, New York City (Chester B. Salomon, New York City, of counsel), for plaintiff-appellee.
 Before KAUFMAN, MESKILL and PIERCE, Circuit Judges.
 MESKILL, Circuit Judge:
 This is an appeal from a decision of the United States District Court for the Southern District of New York, Werker, J., dated April 11, 1983, 32 B.R. 701, affirming a decision by the United States Bankruptcy Court for the Southern District of New York, Lifland, J., dated January 17, 1983.
 
 
 1
 The bankruptcy judge below denied appellant Gerald Kaiser a discharge in bankruptcy on the grounds that (a) he transferred property with intent to hinder, delay or defraud his existing and future creditors within one year before the filing of the bankruptcy petition in violation of 11 U.S.C. Sec. 727(a)(2)(A) (1982); and (b) he knowingly, willfully and fraudulently made false oaths in his petition and schedules in contravention of 11 U.S.C. Sec. 727(a)(4)(A) (1982). In addition, the judge impressed a constructive trust on Florida property held in the name of appellant Joan Kaiser to avoid unjust enrichment of Gerald Kaiser to the detriment of his creditors.
 
 
 2
 Appellants challenge these decisions and the jurisdiction of both the bankruptcy court and the district court to hear this dispute. We reject all of appellants' contentions and affirm.
 
 
 3
 * The bankruptcy judge found the following facts. In 1968, appellants Gerald and Joan Kaiser lived in Lawrence, New York, in a residence owned by Joan Kaiser's parents. Gerald Kaiser made all of the mortgage payments on the property from that date until the property was sold. In 1970, in exchange for $12,000 paid by Gerald Kaiser to his in-laws, they transferred title to the property to their daughter Joan. Until the property was sold in 1978, only Gerald Kaiser's funds were used to pay for the expenses and improvements to the residence.
 
 
 4
 In October, 1978 Joan Kaiser took title to residential property in Miami, Florida. Joan Kaiser paid no financial consideration for the transfer to her of the Florida property; the $50,000 cash down payment was provided solely from Gerald Kaiser's funds. Both appellants executed a purchase money mortgage in the amount of $245,000. Appellants then moved into the Florida residence.
 
 
 5
 At that time, Gerald Kaiser had no cognizable assets and had outstanding liabilities of at least $494,901.32, the majority of which remained outstanding at the time of the filing of the petition in bankruptcy.
 
 
 6
 Gerald Kaiser continued to exercise full dominion and control over the property. He claimed deductions for real estate taxes paid in computing taxable income on his individual federal income tax returns for 1979 through 1981. He listed the property among his assets on a personal financial statement given to a Florida bank when he sought to obtain a loan.
 
 
 7
 Although Gerald Kaiser's funds were used for mortgage payments and maintenance and improvement of the Florida property, these payments were not made directly from accounts in his name. Rather, they were made from the accounts of corporations that he alone created and funded. These corporations conducted no business whatsoever.
 
 
 8
 In his February 1981 bankruptcy petition, Gerald Kaiser stated that New York was his state of domicile for the 180-day period preceding the filing of the petition. In May 1982 he stated under oath at the Adjourned Meeting of Creditors that his domicile was New York. In spite of this, in an affidavit in support of his motion to dismiss the appellee's complaint dated July 9, 1982, he swore under penalty of perjury that he had been a domiciliary of Florida for four years. He made a similar statement in a subsequent affidavit dated August 17, 1982.
 
 
 9
 Although Kaiser listed in his amended schedule several creditors to whom his obligations arose after the filing of the petition, he omitted certain obligations and assets. He failed to note in his petition his obligation on the Florida mortgage. He also failed to list as assets any interest in moneys held in corporate accounts which he controlled, including those from which he paid the expenses of the Florida residence, despite the fact that he made deposits of his funds into these accounts within one year of the petition. These statements were made under oath.
 
 
 10
 The bankruptcy judge found that Gerald Kaiser had transferred funds and incurred obligations for the purchase, maintenance and improvement of premises in Florida and New York with actual intent to hinder, delay and defraud existing and future creditors. The judge stated that the transfers Gerald Kaiser made and obligations he incurred constituted fraudulent conveyances under 11 U.S.C. Sec. 548(a) (1982), N.Y.Debt. and Cred.Law Sec. 276 (McKinney 1945) and Fla.Stat.Ann. Sec. 726.01 (1969). He determined that Joan Kaiser either knew or had reasonable cause to know of Gerald Kaiser's actual intent. The judge ruled that the trustee in bankruptcy, pursuant to 11 U.S.C. Sec. 548(a)(1), could avoid those transfers and obligations that occurred within one year prior to the filing of the bankruptcy petition. The judge also concluded that the trustee in bankruptcy could avoid these transfers of funds pursuant to 11 U.S.C. Sec. 544 (1982) because at all times since the date of purchase of the Florida property, Gerald Kaiser had creditors who could have avoided the transfers.
 
 
 11
 The bankruptcy judge determined that because Kaiser transferred property without adequate consideration within one year of the filing of the petition with actual intent to hinder, delay or defraud his creditors, his discharge should be denied under 11 U.S.C. Sec. 727(a)(2)(A). He also concluded that Gerald Kaiser knowingly, willfully and fraudulently made false oaths and thus he denied Kaiser's discharge pursuant to 11 U.S.C. Sec. 727(a)(4)(A). Finally, the judge impressed a constructive trust in favor of the trustee upon the Florida premises held in the name of Joan Kaiser because the retention of the premises would result in unjust enrichment to Kaiser to the detriment of the creditors of the estate.
 
 II
 
 12
 Appellants contend initially that the bankruptcy judge had no jurisdiction to hear the instant dispute and to render a final judgment. They assert that the Supreme Court's decision in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Marathon ), invalidated the bankruptcy jurisdiction of both the bankruptcy courts and the district courts granted in 28 U.S.C. Sec. 1471 (Supp. IV 1980). They claim that even if the Court did not strike down the jurisdictional grant to the district courts, those courts could not enact Emergency Bankruptcy Rule I (Rule) to "revive" the bankruptcy courts and empower them to hear bankruptcy disputes and related matters. They argue that even if the Rule is valid as a general proposition, a bankruptcy judge cannot constitutionally enter a final judgment. Finally, they claim that even if the bankruptcy judge could enter a final judgment in a traditional bankruptcy matter, the instant case is one involving a "related proceeding" and thus cannot be finally determined by the bankruptcy judge in accordance with both Marathon and the Rule. In particular, they contest the bankruptcy judge's jurisdiction to issue a final judgment that imposes a constructive trust upon the Florida property in favor of the trustee in bankruptcy where the debtor was not the record owner of the property. We deal with these contentions individually.
 
 A.
 
 13
 Appellants make the all-too-familiar claim that Marathon declared 28 U.S.C. Sec. 1471 unconstitutional in toto, leaving the district courts without jurisdiction to hear bankruptcy matters. 28 U.S.C. Sec. 1471 provides in pertinent part:
 
 
 14
 (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
 
 
 15
 (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.
 
 
 16
 (c) The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.
 
 
 17
 Marathon in no way involved the jurisdiction of the district courts. The issue in the case was whether Congress could constitutionally invest the bankruptcy courts, as non-Article III courts, with the power to hear a case involving a state law claim extraneous to the bankruptcy action and to issue a final judgment therein. The plurality found that Congress could not constitutionally grant the bankruptcy court jurisdiction over the state law claim. Because the plurality could not conclude that Congress would have been willing to retain the jurisdictional grant only for some of the claims in section 1471 if the remainder of the jurisdictional grant was found unconstitutional, it simply struck down on separability grounds the entire grant of jurisdiction over bankruptcy matters to the bankruptcy court.
 
 
 18
 The plurality thus noted in Marathon that "the broad grant of jurisdiction to the bankruptcy courts contained in 28 U.S.C. Sec. 1471 ... is unconstitutional." 458 U.S. at 87, 102 S.Ct. at 2880. It did not declare that the district courts had no jurisdiction in bankruptcy matters. Appellants cite language from the following passage to support their proposition that no federal court has bankruptcy jurisdiction:
 
 
 19
 It is clear that, at the least, the new bankruptcy judges cannot constitutionally be vested with jurisdiction to decide this state-law contract claim against Marathon. As part of a comprehensive restructuring of the bankruptcy laws, Congress has vested jurisdiction over this and all matters related to cases under title 11 in a single non-Art. III court, and has done so pursuant to a single statutory grant of jurisdiction. In these circumstances we cannot conclude that if Congress were aware that the grant of jurisdiction could not constitutionally encompass this and similar claims, it would simply remove the jurisdiction of the bankruptcy court over these matters, leaving the jurisdictional provision and adjudicatory structure intact with respect to other types of claims, and thus subject to Art. III constitutional challenge on a claim-by-claim basis. Indeed, we note that one of the express purposes of the Act was to ensure adjudication of all claims in a single forum and to avoid the delay and expense of jurisdictional disputes.... Nor can we assume, as THE CHIEF JUSTICE suggests ... that Congress' choice would be to have this case "routed to the United States district court of which the bankruptcy court is an adjunct." We think that it is for Congress to determine the proper manner of restructuring the Bankruptcy Act of 1978 to conform to the requirements of Art. III, in the way that will best effectuate the legislative purpose.
 
 
 20
 458 U.S. at 87-88 n. 40, 102 S.Ct. at 2880-2881 n. 40 (citations omitted). But this language only refers to the question of whether the unconstitutional grant of authority to the bankruptcy courts can be severed from the remainder of the jurisdictional grant. It does not refer to the constitutionality of district court jurisdiction either explicitly or implicitly.
 
 
 21
 Justice Rehnquist's concurrence and Chief Justice Burger's dissent, see note 2 infra, also focused solely on the jurisdiction of the bankruptcy courts. Justice Rehnquist, joined by Justice O'Connor, agreed with the plurality that the unconstitutional part of the grant of jurisdiction to the bankruptcy courts could not be separated from the constitutional part:
 
 
 22
 I would ... hold so much of the Bankruptcy Act of 1978 as enables a Bankruptcy Court to entertain and decide Northern's lawsuit over Marathon's objection to be violative of Art. III of the United States Constitution. Because I agree with the plurality that this grant of authority is not readily severable from the remaining grant of authority to Bankruptcy Courts under Sec. 1471, see ... n. 40, I concur in the judgment.
 
 
 23
 458 U.S. at 91-92, 102 S.Ct. at 2881-2882 (emphasis added). Justice Rehnquist's concurrence did not question district court jurisdiction. Similarly, Chief Justice Burger's dissent stated explicitly that the plurality's holding was limited to the breadth of the jurisdictional grant to the bankruptcy courts. Id. at 92, 102 S.Ct. at 2882 (Burger, C.J., dissenting). It also stated that neither the bankruptcy courts nor their adjudication of most bankruptcy claims was unconstitutional and it did not attack the jurisdiction of the district courts at all.
 
 
 24
 It is thus clear that the Court invalidated only the section 1471(c) jurisdictional grant to the bankruptcy courts and not the jurisdictional grant to the district courts under section 1471(a) and (b). "The difficulty was not in separating Sec. 1471(c) from Sec. 1471(a) and (b), but in separating jurisdiction over 'this case,' i.e. a case like Marathon, requiring an Art. III court, from the other appropriate jurisdiction of the bankruptcy court over non-Art. III matters, all of which were combined in the words 'all of the jurisdiction' in 28 U.S.C. Sec. 1471(c)." In re Braniff Airways, Inc., 27 B.R. 231, 234 (Bkrtcy.N.D.Tex.), aff'd, 700 F.2d 214 (5th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983). Other courts agree that the Supreme Court did not invalidate the jurisdictional grant to the district courts. E.g., White Motor Corp. v. Citibank, N.A., 704 F.2d 254, 259-60 (6th Cir.1983); In re Hansen, 702 F.2d 728, 729 (8th Cir.1983); In re Q1 Corp., 28 B.R. 647, 652 (D.C.E.D.N.Y.1983). But see Rhodes v. Stewart, 705 F.2d 159, 160 (6th Cir.1983) (section 1471 declared unconstitutional in toto in Marathon ) (dicta).
 
 
 25
 Thus, section 1471(a) and (b) still explicitly vests jurisdiction in the district courts in "all cases under title 11" and "all civil proceedings arising under title 11 or arising in or related to cases under title 11." In addition, Marathon did not invalidate 28 U.S.C. Sec. 1334 (1976) (old section 1334), which provides that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of all matters and proceedings in bankruptcy." This provision is effective until April 1, 1984 when the new system for bankruptcy adjudication was to have permanently taken effect. Therefore, we conclude that the district courts retain broad original jurisdiction to entertain bankruptcy and related cases, under both section 1471(a) and (b) and old section 1334. See In re Boileau, 30 B.R. 795, 796 (D.C.S.D.Cal.1983); In re Lear Colorprint, 29 B.R. 438, 440-41 (D.C.N.D.Ill.1983).
 
 B.
 
 26
 Appellants contend that even if the district courts retain jurisdiction over bankruptcy matters, they cannot constitutionally delegate this power to the bankruptcy judges by creating rules for bankruptcy adjudication. They therefore challenge the promulgation of Emergency Bankruptcy Rule I.
 
 
 27
 The Rule, relating to the powers of bankruptcy judges and district court review of judgments and proposals of bankruptcy judges, was recommended to the judicial districts of the Second Circuit by the Judicial Council by memorandum dated October 21, 1982[1] because of the Supreme Court's refusal to stay the effective date of Marathon beyond December 24, 1982. The Board of Judges for the United States District Court for the Southern District of New York adopted the Rule on December 21, 1982.
 
 
 28
 The district court's promulgation of the Rule is not inherently suspect. The Supreme Court has authorized the district courts to promulgate bankruptcy rules and regulations:
 
 
 29
 Circuit councils which have authorized bankruptcy appellate panels pursuant to 28 U.S.C. Sec. 160 and the district courts in districts in which an appellate panel has not been authorized may by action of a majority of the judges of the council or district court make and amend rules governing practice and procedure for appeals from the bankruptcy courts to the respective bankruptcy appellate panel or district court, not inconsistent with the rules of this Part VIII.... In all cases not provided for by rule, the district court or the bankruptcy appellate panel may regulate its practice in any manner not inconsistent with these rules.
 
 
 30
 Bkrtcy.R. 8018, 51 U.S.L.W. 4484-85 (U.S. Apr. 25, 1983).
 
 
 31
 This provision was part of proposed bankruptcy rules the Supreme Court transmitted to Congress pursuant to 28 U.S.C. Sec. 2075 (Supp. V 1981) in April 1983. With one exception not relevant here Congress did not act upon them and they became effective on August 1, 1983. See Bkrtcy.R. 927, 411 U.S. 1103, 93 S.Ct. 3173, 37 L.Ed.2d lxxx (1973) (no longer in force, but identical in substance). These bankruptcy rules can be presumed to be constitutional. See Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (Federal Rules of Civil Procedure). Also, it is unlikely that the Supreme Court would promulgate procedural bankruptcy rules for the bankruptcy courts and the district courts in 1983 if its 1982 decision in Marathon invalidated the jurisdiction of both the bankruptcy courts and the district courts.
 
 
 32
 Furthermore, promulgation of the Rule is within the district courts' power pursuant to 28 U.S.C. Sec. 2071 (1976), which provides that the district courts "may from time to time prescribe rules for the conduct of their business." See also Fed.R.Civ.P. 83. The district courts have used their rulemaking power not to create bankruptcy courts but to use the structure for bankruptcy adjudication left intact by Marathon and to sustain life in the congressionally mandated bankruptcy scheme. See In re Herrera, 29 B.R. 49, 50-51 (D.C.D.Colo.1983); In re Braniff Airways, Inc., 27 B.R. at 235. But see In re South Portland Shipyard and Marine Railways Corp., 32 B.R. 1012 (D.C.D.Maine 1983) (Emergency Bankruptcy Rule violates Fed.R.Civ.P. 53); In re United Grocers Corp., 29 B.R. 309, 314 (Bkrtcy.D.N.J.1983) (only Congress may promulgate the Rule); In re Williamson, 28 B.R. 276, 281 (Bkrtcy.M.D.Ga.1983) (same).
 
 
 33
 To support their position that the district courts cannot delegate power to the bankruptcy judges, appellants point to the plurality's statement in Marathon that "[w]e think that it is for Congress to determine the proper manner of restructuring the Bankruptcy Act of 1978 to conform to the requirements of Art. III, in the way that will best effectuate the legislative purpose." 458 U.S. at 88 n. 40, 102 S.Ct. at 2880 n. 40. Certainly any permanent restructuring of the federal bankruptcy jurisdiction is solely a matter for congressional action. It cannot be fairly argued, however, that the Court in Marathon intended to hamstring the district courts in the exercise of their bankruptcy jurisdiction. As we explained earlier, the plurality's statement was made in the context of its refusal to separate the exercise of jurisdiction by the bankruptcy court in Marathon from the general grant of jurisdiction found in section 1471(c). The plurality noted that it could not determine what the congressional response would be to Marathon. As such, the plurality decided to strike down all of section 1471(c), leaving the response up to Congress. At no point did the plurality suggest that the district courts were powerless to sustain proper bankruptcy court jurisdiction until the time that Congress chooses to act.
 
 C.
 
 34
 Having determined that the district courts acted properly by promulgating rules for bankruptcy adjudication, we now turn our attention to the validity of the Rule itself.
 
 
 35
 The Rule is virtually identical to the Sixth Circuit's emergency bankruptcy rule, which has been described as follows:
 
 
 36
 First, the bankruptcy judges may not issue binding judgments in "related" proceedings. In these cases, the bankruptcy judges are limited to submitting findings of fact and proposed rulings which must be reviewed de novo by the district court whether or not an appeal has been taken by the parties. See Rule (e)(2)(A)(iii)....
 
 
 37
 Second, ... the interim rule institutes several protective changes in the procedures for the adjudication of all bankruptcy cases, "related" and traditional. The district courts have specific authority to revoke the referral of any case to the bankruptcy court upon the district court's own motion or upon the request of a party for any reason. Thus, the district courts can ensure that the parties receive a just resolution of bankruptcy cases within the limitations established by Art. III.
 
 
 38
 Third, even in traditional bankruptcy cases, the district courts may hold a hearing and receive evidence in cases first adjudicated by the bankruptcy court. The district court need give no deference to the bankruptcy judge's factual findings or interpretations of the law. The district court may modify, in whole or in part, any order or judgment issued by the bankruptcy judge. See Rule (e)(2)(B).
 
 
 39
 White Motor Corp., 704 F.2d at 263.
 
 
 40
 Appellants contend that, even assuming the correctness of the determination by the courts below that the instant dispute is not "related," section (d)(2) of the Rule, which permits the bankruptcy judge to render a final judgment in a traditional dispute, is unconstitutional because of Marathon. This argument is also without merit.
 
 
 41
 Marathon only invalidated the jurisdiction of the bankruptcy court to make final determinations in matters that could have been brought in a district court or a state court (i.e., "related proceedings"). See In re Turner, 29 B.R. 419, 421-22 (D.C.N.D.N.Y.1983). In no way did Marathon implicate the jurisdiction of the bankruptcy courts in other matters within the "traditional" bankruptcy jurisdiction. The Court's invalidation of the jurisdictional grant was on separability grounds, not on the grounds that bankruptcy courts could not adjudicate traditional bankruptcy matters.[2] As the court in White Motor Corp. noted, "[T]he referees under the Chandler Act and the bankruptcy judges after the 1973 Amendments have adjudicated traditional bankruptcy matters ... without constitutional challenge for over a century." 704 F.2d at 263. See also In re Color Craft Press, Ltd., 27 B.R. 962, 966 (D.C.D.Utah 1983) ("[s]uch a device did yeoman service in the bankruptcy field from at least 1898 until 1978 and does yeoman service in other fields as well").
 
 
 42
 There are also strong policy reasons for allowing bankruptcy judges to enter final judgments in traditional bankruptcy disputes. First, the practice eliminates the need for the district courts to enter every bankruptcy case at the beginning. District courts are thus free to attend to the other matters on their crowded calendars, giving all litigants a better opportunity to have their day in court. Second, all cases are not appealed. There should be at least one adjudication made by a judge with expertise in bankruptcy law. There is no assurance that a better initial determination would be made by a district court.
 
 
 43
 In addition, the Rule provides for district court review as a safeguard against bankruptcy court abuses. Section (e)(2)(B) of the Rule permits a district court to make a de novo review of the bankruptcy judge's findings. Any abuses may be rectified by the district court without applying the stringent "clearly erroneous" test. See United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Section (e)(1) of the Rule grants an appeal of the final judgment of the bankruptcy judge as a matter of right.
 
 
 44
 The disposition of cases by bankruptcy judges is also under the control and supervision of the district courts. Section (c)(2) of the Rule provides that even in a traditional case "[t]he reference to a bankruptcy judge may be withdrawn by the district court at any time on its own motion or on timely motion by a party." Section (d)(2) also permits a district court to stay the final judgment of a bankruptcy judge.
 
 
 45
 Given the policy considerations supporting the bankruptcy courts' power to issue final judgments in a traditional bankruptcy case, and absent a Supreme Court decision denying that power, we conclude that the Rule is constitutional. Accord White Motor Corp., 704 F.2d at 263-65; In re Hansen, 702 F.2d at 729; In re Braniff Airways, Inc., 27 B.R. at 236, aff'd, 700 F.2d at 215; In re Pioneer Ford Sales, Inc., 30 B.R. 458, 461 (D.C.D.R.I.1983); In re Lear Colorprint, 29 B.R. at 441; In re Color Craft Press, Ltd., 27 B.R. at 965-66. But cf. In re Matlock Trailer Corp., 27 B.R. 318, 328 (D.C.M.D.Tenn.1983) (bankruptcy court cannot constitutionally enter a final judgment) (overruled sub silentio by White Motor Corp.).
 
 D.
 
 46
 Appellants' final claim is that the present case is a "related proceeding." In an attempt to conform to the stricture of Marathon, the Rule provides that the bankruptcy judge may not enter a final judgment in a related proceeding. Section (d)(3)(B). Thus, if this case is a related proceeding, the final order of the bankruptcy court is unconstitutional according to Marathon and also violates section (d)(3)(B) of the Rule; if it is not, the final order is constitutional and satisfies the requirements of section (d)(2) of the Rule.
 
 
 47
 Our analysis of whether the instant case presents a related claim must start with appellee's demand for relief. In his first complaint, dated February 22, 1982 and amended on September 23, 1982, the trustee sought to deny the debtor's discharge on the ground that the debtor (a) transferred property with intent to hinder, delay or defraud his creditors within one year prior to the filing of his petition; and (b) knowingly and fraudulently made false oaths. The trustee's second complaint, dated March 31, 1982, sought to impose a constructive trust in favor of the trustee on real property held by the debtor's wife because of the debtor's fraudulent transfers concerning the property and to avoid fraudulent transfers made by the debtor.
 
 
 48
 Appellants argue that the trustee could have brought an action to impose a constructive trust in state court. Therefore, under section (d)(3)(A) of the Rule, which defines a related proceeding as one that "could have been brought in a district court or state court," the instant dispute is a related proceeding. Section (d)(3)(A) of the Rule states in full, however, that:
 
 
 49
 Related proceedings are those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or state court. Related proceedings include, but are not limited to, claims brought by the estate against parties who have not filed claims against the estate. Related proceedings do not include: ... orders to turn over property of the estate; proceedings to set aside preferences and fraudulent conveyances; ... proceedings to object to the discharge .... A proceeding is not a related proceeding merely because the outcome will be affected by state law.
 
 
 50
 The Rule thus explicitly states that an action to impose a constructive trust is not a related proceeding, although an action to impose a constructive trust, viewed by itself, is one that could be brought in a state court. It is certainly true that state courts commonly impose constructive trusts. What appellant ignores, however, is that this action was brought as a result of his fraudulent transfers in light of the bankruptcy laws. This action is inextricably tied to the creation of the estate in bankruptcy for the benefit of Gerald Kaiser's creditors; there would be no cause of action without the federal bankruptcy statutes that authorize it. In other words, federal law provides the right upon which the remedy of the constructive trust sought here is based. In contrast, the action in Marathon was independent of the bankruptcy laws. There, the debtor, Northern Pipeline Co., would have had an action based on state contract law against Marathon Pipe Line Co. irrespective of whether Northern filed for bankruptcy; that Northern had so filed had no bearing whatsoever on the issues involved or the outcome of the case.
 
 
 51
 The present action is not a "traditional" action to impose a constructive trust upon real estate. It has no life of its own in either state or federal common law or statute independent of the federal bankruptcy laws. This action is not a related proceeding for the purposes of section (d)(3)(A) of the Rule or for constitutional purposes. See Moody v. Amoco Oil Co., 31 B.R. 224, 225 n. 1 (D.C.W.D.Wis.1983) ("the question of whether a proceeding is 'related' or not depends upon whether the party opposing the debtor is a creditor").
 
 III
 
 52
 In turning to the substantive issues, appellant Gerald Kaiser maintains that the facts do not establish a scheme of intent to defraud creditors. We disagree.
 
 
 53
 Fraudulent intent is rarely susceptible to direct proof. In re Saphire, 139 F.2d 34, 35 (2d Cir.1943). Therefore, courts have developed "badges of fraud" to establish the requisite actual intent to defraud. In re Freudmann, 362 F.Supp. 429, 433 (S.D.N.Y.1973), aff'd, 495 F.2d 816 (2d Cir.1974) (per curiam). Among the circumstances from which courts have inferred intent to defraud are:
 
 
 54
 [C]oncealment of facts and false pretenses by the transferor, reservation by him of rights in the transferred property, his absconding with or secreting the proceeds of the transfer immediately after their receipt, the existence of an unconscionable discrepancy between the value of property transferred and the consideration received therefor ... [and] the creation by an oppressed debtor of a closely-held corporation to receive the transfer of his property.
 
 
 55
 4 Collier on Bankruptcy p 548.02 at 548-34 to 38 (L. King 15th ed. 1983) (footnotes omitted). The court in In re May, 12 B.R. 618, 627 (Bkrtcy.N.D.Fla.1980), characterized the badges of fraud as follows:
 
 
 56
 (1) the lack or inadequacy of consideration;
 
 
 57
 (2) the family, friendship or close associate relationship between the parties;
 
 
 58
 (3) the retention of possession, benefit or use of the property in question;
 
 
 59
 (4) the financial condition of the party sought to be charged both before and after the transaction in question;(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
 
 
 60
 (6) the general chronology of the events and transactions under inquiry.
 
 
 61
 The transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud. See, e.g., In re Cadarette, 601 F.2d 648, 651 (2d Cir.1979). The shifting of assets by the debtor to a corporation wholly controlled by him is another badge of fraud. See, e.g., Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941).
 
 
 62
 The Kaiser fact situation presents both badges of fraud. While insolvent, he purchased two homes with his own money, but had title to both placed in the name of his wife who provided no consideration for these transfers. He continued to retain the possession, benefit and use of the properties and treated them as his own. He created dummy corporations in order to hide his assets. He concealed these assets in his petition for bankruptcy. This scenario clearly indicates a scheme to defraud creditors.
 
 
 63
 Kaiser's argument that the facts of this case do not fit the "prototype" of an intent to defraud case is factually incorrect and irrelevant. Fraudulent acts are as varied as the fish in the sea. Thus, the fact that the transfers in question did not occur on the "eve of bankruptcy" and the fact that Gerald Kaiser is not a corporation are insignificant. The intent to defraud is obvious.
 
 
 64
 Kaiser claims that putting the title to the Florida property in his wife's name could not be fraudulent because his home was absolutely exempt from creditors under the Florida homestead law. See Beall v. Pinckney, 150 F.2d 467 (5th Cir.1945). The claim is illusory because Beall would not support a homestead exemption in these circumstances. Beall explicitly states that there must be a determination "whether there was a fraudulent purpose to hinder [a] creditor, or a good faith intention to provide a homestead for the family." 150 F.2d at 471. As the court noted in Mansell v. Carroll, 379 F.2d 682, 685 (10th Cir.1967), "[t]he homestead exemption is for the benefit of the family and the protection of the family home. It was never intended as a device to effectuate frauds and a court of equity should not countenance any wrongful use of the homestead right." Kaiser failed the Beall test when the bankruptcy judge found that title to the Florida property was placed in his wife's name with the intent to defraud. Furthermore, Kaiser is barred from claiming the Florida homestead exemption because he claimed under oath that New York was his domicile and he elected the federal scheme of exemptions.[3]
 
 
 65
 In sum, there was ample basis for the bankruptcy judge to conclude that appellant intended to hinder, delay or defraud his creditors. The findings of fact were not erroneous and will not be set aside. The denial of discharge was proper.[4] Because there was overwhelming evidence that the funds for the Florida property were supplied solely by Gerald Kaiser, the premises could be impressed with a constructive trust. Banister v. Solomon, 126 F.2d 740, 741 (2d Cir.1942) (L. Hand, J.) (trustee in bankruptcy may have a constructive trust impressed on premises conveyed to debtor's wife where debtor provided the funds to purchase the property while he was insolvent); Elliott v. Elliott, 365 F.Supp. 450 (S.D.N.Y.1973); In re Rodriguez, 24 B.R. 12 (Bkrtcy.S.D.Fla.1982).
 
 
 66
 The judgment of the district court is affirmed
 
 
 67
 .
 
 
 
 [1]
 In so doing, the Judicial Council of the Second Circuit was acting pursuant to the power vested in it by 28 U.S.C. Secs. 331 and 332(d) (1976 & Supp. V 1981). The parties do not question the power of the Judicial Council to make this recommendation
 
 
 [2]
 Indeed, the plurality in Marathon stated that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, ... may well be a 'public right' " and thus subject to adjudication in an Article I court. 458 U.S. at 71, 102 S.Ct. at 2871. See also 458 U.S. at 92, 102 S.Ct. at 2882 (Burger, C.J., dissenting) ("I write separately to emphasize that, notwithstanding the plurality opinion, the Court does not hold today that Congress' broad grant of jurisdiction to the new bankruptcy courts is generally inconsistent with Article III .... Rather, the Court's holding is limited to the proposition stated by JUSTICE REHNQUIST in his concurrence in the judgment--that a 'traditional' state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent consent of the litigants, be heard by an 'Article III court' if it is to be heard by any court or agency of the United States. This limited holding, of course, does not suggest that there is something inherently unconstitutional about the new bankruptcy courts; nor does it preclude such courts from adjudicating all but a relatively narrow category of claims 'arising under' or 'arising in or related to cases under' the Bankruptcy Act.")
 
 
 [3]
 To this end, appellant claims that he should be allowed to amend his petition to designate Florida as his domicile and to claim the Florida rather than the federal exemption. Appellant seeks to escape the consequences of his scheme to defraud in this manner. The decision below denying appellant's motion on this question was entirely proper. See Gardner v. Johnson, 195 F.2d 717 (9th Cir.1952) (generally, a debtor waives a homestead exemption that he voluntarily fails to list)
 
 
 [4]
 In light of this conclusion, we need not address the question of the propriety of the denial of discharge based upon false oaths, other than to note that the decision below was correct in all respects. Appellant's attempts to justify his misconduct by the actions of others and his own inadvertence are unpersuasive. See In re Diorio, 407 F.2d 1330, 1331 (2d Cir.1969) (per curiam) ("reckless indifference to the truth ... is the equivalent of fraud"); In re Diodati, 9 B.R. 804, 808 (Bkrtcy.D.Mass.1981) ("the cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by Sec. 727(a)(4)(A).")